Cara Leslie **ALEXANDER,**
et al., Plaintiffs,

v.

**FEDERAL BUREAU OF
INVESTIGATION, et
al., Defendants.**

Nos. Civ. 96–2123 RCL, Civ. 97–1288 RCL.

United States District Court,
District of Columbia.

Dec. 23, 1998.

⊷1451

Larry Elliot Klayman, Judicial Watch, Inc., Washington, DC, for plaintiffs.

James Jordan Gilligan, Elizabeth Jane Shapiro, Julia Fayngold, U.S. Department of Justice, Washington, DC, for defendant FBI and Executive Office of the President.

David Evan Kendall, Nicole Kay Seligman, Paul Benedict Gaffney, Williams & Connolly, Washington, DC, for defendant Hillary Rodham Clinton.

James Franklin Fitzpatrick, Michael R. Geske, Arnold & Porter, Washington, DC, Peter Z. Zimroth, Arnold & Porter, New York City, for defendant Bernard W. Nussbaum.

Randall James Turk, David S. Cohen, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, DC, for defendant Craig Livingstone.

Robert Weinberg, Bredhoff & Kaiser, P.L.L.C., Washington, DC, Robert Muze, Stein, Mitchell & Mezines, Washington, DC, for defendant Anthony Marceca.

Robert Stephen Bennett, Carl Stephen Rauh, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC, for Non–Party Harold Ickes.

*MEMORANDUM AND ORDER*

LAMBERTH, District Judge.

This matter comes before the Court on Plaintiffs' Motion to Compel Further Testimony and Further Production of Documents from Non–Party Harold Ickes, for Appointment of a Special Master, for Criminal Contempt and Perjury Proceedings, and for Sanctions, Including Attorneys' Fees and Costs. Upon consideration of this motion, the oppositions of defendant Executive Office of the President and non-party Ickes, and plaintiffs' replies thereto, the Court will GRANT IN PART and DENY IN PART Plaintiffs' motion, as discussed and ordered below.

I. *Background*

The underlying allegations in this case arise from what has become popularly known as "Filegate." Plaintiffs allege that their privacy interests were violated when the FBI improperly handed over to the White House hundreds of FBI files of former political appointees and government employees under the Reagan and Bush Administrations. The instant dispute revolves around the deposition of Harold Ickes, former Deputy Chief of Staff and Assistant to the President at the

White House from January 1994 until January 1997. The disputes currently before the Court divide up into three general categories: (1) threshold issues, including service of process of the subpoena and the timeliness of objections to plaintiffs' subpoena duces tecum; (2) document production issues, including relevance, privileges, and re-deposition regarding document production searches; and (3) pure testimonial issues, including privileges, leave for re-deposition, and compelling testimony on unanswered questions.

## II. *Threshold Issues*

### A. *Service of Process*

■ The Ickes deposition took place on May 21, 1998. Given some of the testimony during this deposition and some of the discussion in plaintiffs' and Ickes' legal memoranda, the Court must first address a service of process matter. It is well settled that, under FED.R.CIV.P. 45(b), Ickes' deposition subpoena must have been personally served upon him. *See FTC v. Compagnie de Saint–Gobain–Pont–a–Mousson*, 636 F.2d 1300, 1312 (D.C.Cir.1980); 9ACHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2454, at 24 (1995). Plaintiffs and Ickes have two contrasting stories on the facts with regard to when and whether personal service of process occurred.

Plaintiffs claim that Ickes was personally served with a subpoena on April 29, 1998, which is supported by the Affidavit of Service of Process. This certified affidavit, sworn to by the process server, states that service was made upon Harold Ickes, on April 29, 1998, at 8:00 p.m., at his residence in Washington, D.C. The affidavit goes on to give a physical description of Ickes, which further evidences the argument for personal service upon him. Based on this evidence, plaintiffs claim that Ickes was personally served in compliance with FED.R.CIV.P. 45(b).

As Ickes points out in his memorandum in opposition to plaintiffs' motion to compel, he testified at his deposition that he was never personally served with the subpoena. Ickes Depo. at 6–8. Specifically, Ickes contends that the first time he saw the subpoena was approximately one and one-half weeks before the deposition, when his wife called it to his attention. *Id.* at 7. According to Ickes, "Apparently, it had been stuffed in my mailbox or left on the front door, on the front steps of my house." *Id.* Hence, Ickes claims that he was not personally served with the subpoena as required by Rule 45.

In spite of the this factual dispute, Ickes never raises with the Court a legal issue regarding service of process. Apparently, this entire discussion is included in Ickes' brief as background (according to the title it falls under) on how he has been attempting to cooperate with plaintiffs' discovery requests in this case. Ickes Opp. to Plaintiffs' Mot. to Compel at 3, 3–4 ("Mr. Ickes, moreover, cooperated with plaintiffs' discovery requests in this case, even though he was not properly served with a subpoena.") The main text of Ickes' brief in this regard merely states that Ickes was not properly served under Rule 45, but never asks for any form of relief. *Id.* One footnote, number 3, gives more detail as to the rule requiring personal service of a subpoena and recounts the history of how Ickes attempted to resolve this service problem with plaintiffs' counsel. Ickes goes on to state that plaintiffs' counsel would not agree to waive his timeliness objections to Ickes' responses to plaintiffs' subpoena duces tecum, so Ickes decided to voluntarily appear at the deposition but also "preserve[ ] his objections based on improper service" in a letter to plaintiffs' counsel. Again, Ickes never requests, by implication or otherwise, any kind of relief from the Court on these "preserved objections." Ickes does not provide any argument on the consequences of any such improper service. Based on these circumstances, the Court concludes that Ickes has not raised an issue as to improper service of process. The issue is therefore waived.

### B. *Timeliness of Ickes' Original Set of Objections*

Plaintiffs contend that Ickes' objections to plaintiffs' subpoena duces tecum are untimely. Rule 45 of the Federal Rules of Civil Procedure sets the deadline for objecting to a subpoena duces tecum by reference to the date of service of the subpoena. FED.

R.Civ.P. 45(c)(2)(B). Under Rule 45, Ickes must have objected within fourteen days after the date of service. Ickes' original set of objections was filed on May 13, 1998, the last day to file timely objections under Rule 45, assuming plaintiffs' version of the facts.[1] Even assuming plaintiffs' version of the facts as to service of the subpoena, plaintiffs' original objections were timely. Therefore, plaintiffs' argument on the timeliness of Ickes' original set of objections is without merit.

## III.   *Document–Related Issues*

### A.   *Background*

Plaintiffs ask this Court to grant them several forms of relief regarding the production of documents, and questioning related to the search for these documents, in response to plaintiffs' subpoena duces tecum. These document-related disputes can be broken down into the following three categories: (1) documents under Ickes' control at his residence in Salt Air, on Fire Island, New York; (2) documents under Ickes' control at 16 West 77th St., New York City; and (3) documents contained in 35–50 boxes removed from the White House by Ickes. With respect to each of these categories, plaintiffs want a special master to be appointed; all documents to be produced to the special master; the special master to produce all responsive, non-privileged documents; and to be able to question Ickes regarding the details of the search for documents.

### 1.   *Salt Air, on Fire Island, New York*

Ickes testified at his deposition that he uses this "residence" as a vacation home. Plaintiffs' counsel asked whether Ickes kept at this location any documents generated during his work on the Clinton Primary campaign, presidential campaign, or in the White House. Ickes could not say that no such documents existed at the Fire Island location; instead, he stated that "I'm not sure, but I have a high degree of doubt that there

are." Ickes Depo. at 46. Based on this testimony, plaintiffs seek the various forms of aforementioned relief.

Ickes responds that an order compelling plaintiffs' requested relief is unnecessary because the issue is moot. After his deposition, Ickes visited his Fire Island home, searched for documents, and found none responsive to plaintiffs' requests. He has filed a declaration, under penalty of perjury, so stating. Ickes Decl. ¶ 7. Plaintiffs reply by asking for leave to re-depose Ickes on these searches, since they were not able to do so at his original deposition.

### 2.   *16 West 77th St., New York City*

As with the Fire Island dispute, plaintiffs questioned Ickes regarding his document production under the subpoena duces tecum with regard to Ickes' former New York City apartment. Ickes lived in this apartment until approximately January of 1994, at which time he moved to Washington, D.C. to work as a member of the White House staff. Although Ickes never succinctly responded at his deposition to plaintiffs' inquiries regarding the adequacy of the search of the New York storage facility (in the basement of his New York apartment building) into which any remaining documents were placed at the time of his move to Washington, he has two explanations for why the facility was not searched. First, any documents contained at the New York City apartment would have predated his employment at the White House, and therefore the only documents that could have been potentially responsive to plaintiffs' subpoena duces tecum were those related to Ickes' work on the President's 1992 campaign. As to that limited set of responsive documents, Ickes testified that by the time of his deposition (and preceding his document search under the current subpoena), he had given all such documents to his attorneys in response to various other investigative requests over the past four years. Hence, although the New York City

---

1.  This subpart of the Memorandum Opinion will only address Ickes' original set of objections. Ickes "supplemental" objections, filed May 15, 1998, would be untimely under Rule 45, if plaintiffs' version of the facts as to service of process is accepted. Thus, a factual finding on the exact

date of service of process would normally be pivotal on this issue. However, because the Court ultimately will not compel Ickes to produce more documents, these supplemental objections ultimately play no role in the dispute before the Court.

storage facility associated with his previous residence was never formally searched, any responsive documents once under his control at that location were in the custody of his attorneys and properly searched pursuant to the subpoena duces tecum. In addition to these two points, Ickes notes that since the time of his deposition, he has sold his New York City apartment and transferred all of the documents that were stored along with it to Washington. As with the Fire Island scenario, Ickes claims to have searched these documents and confirms that none responsive to plaintiffs' requests were found. Ickes Decl. ¶ 6. Again, plaintiffs object to these post-deposition declarations and seek leave to cross-examine Ickes about the statements contained therein.

### 3. *Documents Removed from White House*

As with the previous two searches, plaintiffs' counsel sought to examine Ickes on his search with regard to approximately 35–50 boxes of documents that Ickes took with him when he left the White House around January 20, 1997. Ickes testified that he did not personally search these boxes because he had already turned them over to his attorneys; instead, his attorneys searched them for documents responsive to plaintiffs' subpoena duces tecum. Plaintiffs agree that such a course of action is perfectly acceptable but still wish to inquire into the adequacy of the search.[2] Of course, plaintiffs' counsel could not ask questions of Ickes' counsel, so he directed questions to Ickes about what his counsel had told him about her search.

Ickes' counsel objected to questions regarding what she told her client on the ground of attorney-client privilege. However, Ickes' counsel stated for the record that all responsive, non-objectionable documents in the boxes Ickes removed from the White House were produced.

### B. *Relevancy*

Before turning to plaintiffs' various requests for document-related relief, the Court must first address the issue of relevancy. To the extent that plaintiffs seek to compel information not reasonably calculated to lead to the discovery of admissible evidence in this case, they would not be entitled to an order compelling such production. FED. R.CIV.P. 26(b).

■ The Court finds that plaintiffs' inquires regarding documents kept by Ickes at his New York City apartment storage facility seek irrelevant matter. It is undisputed that Ickes stopped residing at that apartment before he even came to work for the White House. Plaintiffs have elicited no testimony to the effect that Ickes sent documents to that storage facility after he began working for the White House. The Court can see no reason why any such documents would be relevant to the subject matter in this case. Therefore, to the extent plaintiffs seek relief based on documents kept under Ickes' control at his former New York City apartment residence, plaintiffs' motion will be denied.

The same cannot be said, however, about plaintiffs' inquiries about the document production with regard to Fire Island and the White House document removal. Thus, the Court must proceed with its analysis with respect to these two categories of requests.

### C. *Plaintiffs' Requested Relief*

#### 1. *Special Master and a Second Document Production*

■ As stated above, plaintiffs ask this Court to appoint a special master; to compel Ickes to produce all documents from his Fire Island and New York City properties to the special master; to order the special master to cull the documents for responsive, non-privileged documents; and to order the special master to produce these documents. Because the Court has already found the New York City apartment inquiries to be irrele-

---

**2.** As set forth in their motion to compel, plaintiffs seek to receive answers to the two following questions:

1. Did [your counsel] show you whether or not or did she tell you whether or not she found documents that were responsive to [plaintiffs'] subpoena? Ickes Depo. at 89.

2. Did you go through the various document requests in the subpoena with your counsel? Ickes Depo. at 11.

vant, this issue reduces itself to the Fire Island vacation home and White House document removal searches.

The Court finds that an appointment of a special master, along with the related relief described in the preceding paragraph, is unnecessary. As an initial matter, the Court notes that the appointment of a special master is an extraordinary action. As FED. R.CIV.P. 53(b) states, a "reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated." *See also* 9A WRIGHT & MILLER, *supra,* § 2601 (noting that the appointment of a special master is only justified in rare circumstances). Moreover, the D.C. Circuit has found referral to a special master to be erroneous in situations far more complicated than the one presented in this case. *See United States v. Microsoft Corp.,* 147 F.3d 935, 953 (D.C.Cir.1998). Thus, the Court views plaintiffs' request for a special master on this discovery dispute with great skepticism.

Taking Ickes' and his counsel's representations at face value, it appears that the issue of compelling production is moot. Both searches have already been conducted. Ickes states in his declaration that he visited his Fire Island vacation home after the deposition and confirmed his earlier belief that it contained no documents responsive to plaintiffs' subpoena duces tecum. Although the issue of plaintiffs' entitlement to cross-examine Ickes on these representations is a separate matter and addressed below, the fact remains that a search has now been done. Moreover, Ickes' attorneys have searched the boxes that Ickes removed from the White House. Plaintiffs point to nothing that inherently calls these representations into doubt. Thus, the issue of compelling a reproduction of documents is moot.

### 2. *Testimony Related to the Document Searches*

Aside from issues of actual document production, plaintiffs seek to depose Ickes on the statements given in his declaration regarding the Fire Island search. Plaintiffs also want the Court to compel answers to questions posed to Ickes at his deposition regarding his counsel's search of the 35–50 boxes he removed from the White House at the time his employment ended. The Court will grant both requests.

The Court will grant plaintiffs leave to redepose Ickes insofar as they seek to interrogate him on the accuracy and truthfulness of the statement made in his declaration filed subsequent to his deposition as it relates to his search for documents at his Fire Island vacation home. The Court has recently discussed the issue of filing post-deposition declarations in response to questions posed at the deposition. *See Alexander v. FBI,* Memorandum Opinion, C.A. 96–2123, 186 F.R.D. 113 (D.D.C. Dec. 7, 1998) (discussing the deposition of Terry Good).

Under FED.R.CIV.P. 30(a)(2), a party must get leave of court to redepose a person who has already been deposed in the same case. This rule provides that such leave shall be granted to the extent that it would be consistent with the principles enunciated in FED. R.CIV.P. 26(b)(2). The guiding factors in this inquiry are whether:

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

FED.R.CIV.P. 26(b)(2).

Granting plaintiffs leave to redepose Ickes on the Fire Island search comports with these principles. Clearly, the first and second factors—cumulativeness and opportunity to obtain the information in another way—favor granting leave for redeposition. Ickes had not even performed the search at the time of his deposition. The third factor—a

benefit versus burden analysis—is a tougher determination. Nonetheless, the Court finds that because the plaintiffs are limited to a narrow scope of inquiry on this point, any burden suffered is negligible. Therefore, plaintiffs' request for leave to redepose Ickes on the narrow topic of the Fire Island search will be granted.

■ The plaintiffs' request to compel answers to questions posed to Ickes regarding his attorney's search of the 35–50 boxes of documents removed by Ickes from the White House raises different issues. Under FED. R.CIV.P. 26(b)(2), the plaintiffs are entitled to obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ... including the existence, description, nature, custody, condition, and location of any ... documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Ickes does not dispute the propriety of the general subject matter of these questions, but instead claims that the specific inquires posed by plaintiffs' counsel trigger the attorney-client privilege. *See supra* note 4 (listing the questions asked by plaintiffs' counsel on this topic).

The Court will grant plaintiffs' motion to compel Ickes to answer these two questions, and will further grant plaintiffs leave to ask Ickes reasonable follow-up questions on his knowledge of this search. Ickes' counsel stated for the record that she searched the 35–50 boxes at issue and "produced any responsive, non-objectionable documents." Ickes Depo. at 91–92. To the extent that plaintiffs' counsel asked questions about the document search that impinged on the attorney-client privilege, this privilege was waived by Ickes' counsel's statement. Because plaintiffs' counsel has already received answers to his questions through the statements of Ickes' counsel, he may very well receive the same answers from Ickes. Indeed, Ickes himself

states in his post-deposition declaration that "I ... instructed my attorneys to make a diligent and good faith search of my documents maintained at their law firm. They advised me that they did so." Ickes Decl. ¶ 4. Nonetheless, the Court cannot say that the confidentiality of this information has in any way been protected when Ickes' lawyer and Ickes himself have both voluntarily released this matter on the record. Therefore, Plaintiffs are entitled to answers to the two questions posed in the deposition for which they seek to compel answers, along with reasonable follow-up questions tailored to inquire into the adequacy of the search of the 35–50 boxes of documents.

## IV. *Pure Testimonial Issues*

Plaintiffs raise two different issues on pure testimonial matters in connection with the Ickes deposition. First, plaintiffs seek an order compelling Ickes to answer questions regarding a discussion that he claims to have had with the President regarding Kathleen Willey.[3] In his deposition, Ickes testified that he "did have a very brief conversation about [Willey]" with the President. Ickes Depo. at 159. However, when asked about the substance of the conversation, counsel for defendant EOP instructed Ickes not to answer, as seen in the following exchange:

[By plaintiffs' counsel:] What did you discuss about Kathleen Willey?

[By EOP's counsel:] I'm going to object to that and instruct him not to answer.

[By plaintiffs' counsel:] You can respond?

[By EOP's counsel:] No, he can't respond. I'm going to instruct him not to answer. That is a conversation that is subject to a variety of privileges.

[By plaintiffs' counsel:] Which privileges?

[By EOP's counsel:] A variety of privileges.

[By plaintiffs' counsel:] Well, name them.

---

**3.** Plaintiffs seek to compel answers to the following four questions:

1. What did you discuss about Kathleen Willey? Ickes Depo. at 159.
2. Did you discuss with regard to the President the letters that Kathleen Willey had written to him? Ickes Depo. at 161.

3. Did you discuss with the President the release of those letters to Kathleen Willey—from Kathleen Willey, to the public? Ickes Depo. at 161.
4. But you did discuss the contents of the Kathleen Willey letters with the President. Correct? Ickes Depo. at 168.

[By EOP's counsel:] Well, it could potentially be a Presidential communication, it could be deliberative, it could be a number of privileges.

[By plaintiffs' counsel:] Are you claiming Executive Privilege?

[By EOP's counsel:] I am instructing him not to answer on the basis of privilege, because it could be subject to Presidential communications.

Ickes Depo. at 159–60. Defendant EOP, in its brief in opposition to plaintiffs' motion to compel, revealed that it did not wish to perfect its objections with regard to the four questions asked of Ickes about his conversations with the President. Ickes has filed a post-deposition declaration recounting the "totality of [his] recollection about [his] conversation with the President about Ms. Willey." Ickes Decl. ¶ 10. Somewhat confusingly, defendant EOP then argues that Ickes has answered all of plaintiffs' relevant questions regarding this conversation, but that "the remaining questions about his conversation with the President are simply irrelevant." Defendant EOP's Opp. at 3. The Court fails to see how Ickes can file a declaration purporting to recount all of the events he can remember on one hand, but then have government counsel argue that some other questions remain unanswered. Nonetheless, the Court finds that the Ickes declaration should not shield him from being asked the questions posed to him during his deposition, along with reasonable follow-up questions. All of plaintiffs' questions on this topic at the deposition inquired into material reasonably calculated to lead to the discovery of admissible evidence. The Court will not restate again the reasons that a post-deposition declaration will not substitute for deposition testimony on this issue. Plaintiffs' motion to compel testimony on Ickes' conversation with the President regarding Kathleen Willey will be granted.

■ However, the Court will not issue an order to show cause why Ickes should not be held in contempt for perjury in purportedly feigning his memory loss at his deposition. Without going into the laundry list of questions asked by plaintiffs to which Ickes claimed he had no specific memory, suffice it to say that, according to plaintiffs' calculations, Ickes testified that he could not remember (or some equivalent thereof) approximately 84 times, for an average of once every four minutes. A full review of the transcript of Ickes' deposition shows his remarkable inability to recall certain memorable facts, in addition to a contentious demeanor. The Court expresses no opinion on whether this inability is in fact genuine, or whether Ickes' poor memory is simply a convenience. The transcript contains evidence that might support either position under a preponderance standard. In the case of civil contempt, however, the proof must be shown to the high standard of clear and convincing evidence. *See, e.g., Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 61 F.3d 94, 98 (1st Cir.1995); *EEOC v. Local 638,* 81 F.3d 1162, 1171 (2d Cir.1996); *In re Kitchen,* 706 F.2d 1266, 1271 (2d Cir.1983). Indeed, for criminal contempt, proof beyond a reasonable doubt would be required. The Court is not willing to engage in satellite contempt proceedings on this issue at this time. Should stronger evidence be adduced by plaintiffs at some time in the future, then the Court can revisit the issue then. On the current record, however, the Court believes that entering into a morass of circumstantial evidence on feigned memory loss is unnecessary. The evidence adduced now does not meet the clear and convincing standard. Therefore, plaintiffs' request for the commencement of contempt proceedings will be denied.

## IV. *Sanctions*

Plaintiffs ask that the Court sanction Ickes and his counsel for their deposition conduct. Although plaintiffs never set out in their motion exactly what conduct they find sanctionable, the Court assumes that they would point to Ickes' purported feigning of his memory loss, Ickes' failure to personally conduct certain searches, Ickes' refusal to answer questions about his conversation with the President regarding Ms. Willey, and Ickes' counsel's instruction to her client to refuse to answer questions regarding her role in the search for documents responsive to plaintiffs' subpoena duces tecum. The Court will deny plaintiffs' request.

First, as discussed more fully with regard to plaintiffs' request to commence contempt proceedings, Ickes' purportedly feigned memory loss does raise some questions about the veracity of his testimony. Nonetheless, for the same reasons discussed above, the evidence presented so far on this issue does not rise to a sanctionable level.

Second, the searches conducted by Ickes and his counsel do not present sanctionable conduct. Ickes clearly stated that he did not search the Fire Island vacation home because he was almost certain that it contained no responsive documents. Ickes' attorneys, on behalf of Ickes, searched the 35–50 boxes that Ickes removed from the White House. Plaintiffs will be allowed to probe the adequacy of these searches at Ickes' next deposition, but the searches themselves do not lead to sanctions.

■ Third, Ickes' refusal to answer questions regarding his conversations with Willey is not sanctionable. As discussed above, he was instructed not to answer by defendant EOP's counsel on the assertion of the presidential communications privilege. Although defendant EOP chose not to perfect this privilege, they had a right to make such an objection at the deposition given the presumptive privileged nature of such conversations. Ickes cannot be expected to answer questions over an instruction not to do so by defendant EOP's counsel. Therefore, neither Ickes' nor defendant EOP's conduct is sanctionable in this regard.

■ Fourth, Ickes' counsel's instruction to her client not to answer questions probing communications between an attorney and her client regarding the subject matter of the litigation is not sanctionable. Although the Court ultimately holds that any confidentiality that existed on this issue was waived by Ickes' counsel's statements, the assertion of such a privilege cannot be said to lack substantial justification or to have been done in bad faith. Therefore, plaintiffs' request for sanctions against Ickes' and his counsel will be denied.

## V. *Conclusion*

For the reasons stated above, the Court HEREBY ORDERS that Plaintiff's Motion to Compel Further Testimony and Further Production of Documents from Harold Ickes, for Appointment of a Special Master, for Criminal Contempt and Perjury Proceedings, and for Sanctions, Including Attorneys' Fees and Costs is GRANTED IN PART AND DENIED IN PART. In this regard, the Court ORDERS that:

1. Plaintiffs' request for the appointment of a special master is DENIED.

2. Plaintiffs' request that non-party Ickes produce all documents under his control at his residence in Salt Air, on Fire Island, New York and at 16 West 77th St., New York City, and all of the documents he removed from the White House is DENIED as moot.

3. Plaintiffs' motion to compel answers to the following two questions posed at his deposition is GRANTED:

(a) "Did [your counsel] show you whether or not or did she tell you whether or not she found documents that were responsive to [plaintiffs'] subpoena?"

(b) "Did you go through the various document requests in the subpoena with your counsel?"

4. Plaintiffs' request for leave to re-depose Ickes is granted only on the following subject matter:

(a) Ickes' search for documents at his Fire Island vacation home.

(b) Ickes' knowledge of the search for documents in the 35–50 boxes he removed from the White House, including what his counsel told him regarding the adequacy, means, and results of that search.

(c) Ickes' conversation with the President regarding Ms. Willey.

(d) Follow-up questions that are reasonably calculated to lead to the discovery of admissible evidence on the issues listed in sub-paragraphs (a)–(c).

5. Plaintiffs' request for the Court to institute contempt and perjury proceedings against Ickes is DENIED.

6. Plaintiffs' request for sanctions against Ickes and his counsel is DENIED.

SO ORDERED.